AO 91 (Rev. 11/82)                          **CRIMINAL COMPLAINT**

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| | DOCKET NO. | |
|---|---|---|
| UNITED STATES OF AMERICA<br>v.<br>EME CHU NKUGBA | | FILED<br>CLERK, U.S. DISTRICT COURT<br><br>MAY 2 9 2018<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY                      DEPUTY |
| | MAGISTRATE'S CASE NO.<br>18 MJ01370 | |

Complaint for violation of Title 18, United States Code, Sections 1546(a), 2(a)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>December 16, 2015 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

On about December 16, 2015, within the Central District of California, and elsewhere, M.W.A., aided and abetted by defendant EME CHU NKUGBA ("NKUGBA"), did knowingly enter into a marriage for the purpose of evading a provision of the immigration laws.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**LOAN MCINTOSH**   /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Homeland Security Investigations |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br>Frederick F. Mumm | DATE<br>May 29, 2018 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

SF  SAUSA Stacey R. Fernandeze x3152          REC: Detention

## AFFIDAVIT

I, Loan McIntosh, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search the residence of EME CHU NKUGBA ("NKUGBA"), located at 11500 South Budlong Avenue, Apartment 20, in Los Angeles, California ("the SUBJECT PREMISES").   I believe the SUBJECT PREMISES contains evidence, instrumentalities, and fruits of violations of 8 U.S.C. § 1325(c) (Marriage Fraud); 18 U.S.C. §§ 1001(a) (False Statement to a Federal Agency); 1015(a) (False Statements Under Oath Relating to Naturalization, Citizenship or Registry of Alien); and 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents).

2.    This affidavit is also made in support of a criminal complaint against and arrest warrant for, NKUGBA for a violation of 8 U.S.C. § 1325(c); 18 U.S.C. § 2(a).

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.    BACKGROUND FOR SPECIAL AGENT MCINTOSH

4.    I am a Special Agent ("SA") with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), and have been so employed since March 2003.  Prior to my employment with HSI, I was a Special Agent with the United States Customs Service ("USCS"), since February 1995.  I am currently assigned to the Resident Agent in Charge, San Fernando, which is tasked with investigating immigration fraud, trade fraud, Intellectual Property Rights ("IPR") violations, human smuggling, financial crimes, narcotics smuggling and illegal export violations. Prior to my current assignment, I was assigned to the Document and Benefit Fraud Task Force

("DBFTF"), the Joint Terrorism Task Force ("JTTF"), the Intellectual Property Rights Coordination Center in Washington, DC, the USCS Attaché Office for the Philippines, and the HSI Attaché Office in Bangkok. As an HSI SA, I have conducted criminal investigations involving immigration fraud, trade fraud, money laundering, narcotics trafficking, violations of the Protect Act, illegal exports, and intellectual property crimes. During the course of these investigations, I have become familiar with the way that evidence immigration fraud is stored on digital devices. I have participated in the execution of search and arrest warrants and seized evidence of federal law as the case agent and in a secondary role.

### III.  SUMMARY OF PROBABLE CAUSE

5.     I have been working in conjunction with the Citizenship and Immigration Services Fraud Detection and National Security San Fernando Valley Office ("FDNS SFV") on the investigation of NKUGBA, a naturalized U.S. citizen from Nigeria. I have reviewed evidence that leads me to conclude there is probable cause that NKUGBA has facilitated multiple sham marriages between Nigerian and Philippine nationals with U.S. citizens so that the foreign nationals can get Lawful Permanent Resident ("LPR") status and ultimately U.S. citizenship status. The foreign nationals are primarily in the United States on a B2 nonimmigrant visa overstay and are working in the healthcare field.

6.     Based on my interviews with cooperating witnesses, consensual undercover telephone calls and meetings, my review of A-Files, travel records, residential records and telephone toll records, I conclude that there is probable cause to believe that NKUGBA charges approximately $24,000 to arrange the sham marriages. The $24,000 includes marriage to a U.S. citizen that NKUGBA recruited, a medical examination, a location to conduct the wedding ceremony, photographs taken at the wedding ceremony as well as other locations together. NKUGBA also prepares the immigration forms and files the immigration forms with CIS. To date, I have identified that NKUGBA has been in telephone contact with approximately 240 individuals that have filed immigration applications for a benefit with CIS. I believe the telephone contact was to arrange the sham marriages.

7.     I believe based on my training, experience, and knowledge of this investigation that the SUBJECT PREMISES is being used by NKUGBA to facilitate the fraud, including a place that he meets with the foreigners to introduce them to their U.S. citizen spouses, accept payments from the foreigners and to fill out the immigration applications prior to sending them to CIS.

8.     I learned the following from IO Castro:

a.     He suspected that there were three individuals involved in this large scale marriage fraud scheme including, NKUGBA.  He believed that NKUGBA primarily facilitated fraudulent marriages between Nigerian and Philippine nationals with U.S. citizens.

b.     The beneficiaries often entered the United States on B1/B2 nonimmigrant visas and then overstayed their visas.  The beneficiaries primarily worked in the health care business.

c.     NKUGBA's name and/or address are not listed on any of the applications as the preparer, however during interviews with the beneficiaries and petitioners; NKUGBA was identified as the preparer, facilitator or had other involvement in the application process.

d.     The beneficiaries often married African American U.S. citizens that live in the South Los Angeles area.  The beneficiaries and/or the petitioners did not disclose children born from a prior marriage or relationship.  The beneficiaries and petitioners never lived together.

e.     The beneficiaries and petitioners would meet with NKUGBA at his apartment located at 13200 Doty Street, Apartment 210, Hawthorne, California 90250.

f.     NKUGBA paid the petitioners approximately $2,000 or more.  This included the wedding at the chapel and $1,000 after the LPR interview with CIS was complete.

g.     The petitioners would regularly call the beneficiaries for small amounts of money ranging from $100 to $200 until an LPR card was received.

h.     The beneficiaries and petitioners opened up joint bank accounts.

3

     i.     NKUGBA provided the beneficiaries and petitioners with a list of 244 questions to memorize for their LPR interview.

## IV.    BACKGROUND ON CITIZENSHIP AND IMMIGRATION SERVICES AND APPLICATION PROCESS FOR IMMIGRATION BENEFITS

9.    Based upon my conversations with United States Citizenship and Immigration Services ("CIS") Officers and HSI special agents, I know the following:

     a.     CIS is the agency within Department of Homeland Security ("DHS") that is charged with administrating the legal process used by foreign nationals to immigrate to the United States. CIS is responsible for the administration of the immigration and naturalization adjudication functions and for establishing immigration services and policies.

     b.     Immigration benefits overseen by CIS include: United States citizenship/naturalization, lawful permanent residency, family and employment-related immigration, employment authorization, inter-country adoptions, asylum and refugee status, replacement of immigration documents, and foreign student authorization.

     c.     Within the CIS organization, the role of an Immigration Services Officer ("ISO" or "ISO2") (formerly known as a District Adjudications Officer ("DAO")), is to make decisions concerning the eligibility entitlements of individuals seeking immigration benefits, employment, and/or legal status under the laws of the United States. As part of this process, an ISO reviews applications and petitions; conducts interviews; obtains and reviews supporting documentation; and approves/denies applications and petitions. A copy of the ISO's decision is placed in what is known as an "A-File."

     d.     The term "A-File" refers to an Alien Registration File, as maintained by DHS, which contains immigration records for aliens admitted to, or found within, the United States. These records can include, but are not limited to, photographs, fingerprints, court records, and immigration petitions filed by, or on behalf of, an alien.

10.    I have had training regarding the various legal methods by which a foreign citizen can remain in the United States. An alien can obtain lawful permanent resident status, and

ultimately United States citizenship, based on a legitimate marriage to a United States citizen. A marriage entered into fraudulently to obtain an immigration benefit constitutes a violation of 8 U.S.C. Section 1325(c). If an alien marries a United States citizen, the U.S. citizen can file a "Petition for Alien Relative," commonly referred to as a Form I-130, to obtain lawful status for his/her alien spouse. Such a petition would be filed with the CIS. (Prior to March 1, 2003, such a petition was filed with the Immigration and Naturalization Services ("INS"), Department of Justice.) Once an I-130 is filed, the alien relative is allowed to remain in the United States until a decision is made on the petition. Usually, the alien simultaneously files a Form I-485, "Application to Register Permanent Residence or Adjust Status."[1] Once the legitimacy of a marriage has been established, the I-130 is approved. The alien's I-485 application is then reviewed to determine eligibility to become a lawful permanent resident. If the alien appears eligible, his I-485 is approved and s/he is granted conditional resident status (if married to the citizen for less than two years). This lawful status allows him or her to remain and work in the United States. After a period of two years of marriage, the U.S. citizen spouse can file an application to remove the condition from the alien relative's status, commonly referred to as Form I-751. If approved, the alien becomes a lawful permanent resident. After having maintained lawful permanent status as a spouse of a U.S. citizen for three years, the alien can apply for U.S. citizenship via Form N-400, "Application for Naturalization." In order to naturalize, the alien must show, among other things, that s/he was lawfully admitted as a permanent resident and that s/he has been a person of good moral character. An applicant for naturalization is precluded from establishing good moral character if s/he has given false testimony under oath for the purpose of obtaining an immigration benefit.

## V.    STATEMENT OF PROBABLE CAUSE

11.    Based on my conversations with Immigration Officer Gregorio Castro, I know that on or about May 30, 2017, CIS received an anonymous tip letter regarding NKUGBA. The

---

[1] The beneficiary is the subject of the petition, and receives the CIS benefit. The petitioner is the person who files the petition on behalf of the beneficiary.

letter claimed that NKUGBA was arranging fraudulent marriages in exchange for money so that non-citizens could obtain immigration benefits. IO Castro determined that the email address from which the anonymous tip was sent belonged to R.H.M., a Philippine national who had an immigration application that CIS recently denied.

12.    I obtained toll records for the telephone number that R.H.M. provided for NKUGBA for the period of January 1, 2015 through June 20, 2017. IO Castro queried CIS databases for the phone numbers that had been in contact with NKUGBA and determined that approximately 233 applicants had been in contact with NKUGBA.

### A.    Review of A-Files

13.    I reviewed the A-Files provided to me by IO Castro of five individuals who had been in contact with NKUGBA: M.W.A., R.H.M., O.G., J.V.A., and A.D.O. Based on my review of those A-Files, I learned the following:

a.    All five applicants had been married by a pastor named Enrique Escobar ("Escobar"). I reviewed the tolls for NKUGBA's telephone number and determined that there were approximately 201 calls between NKUGBA and Escobar from September 1, 2015 through June 8, 2017.,

b.    All five applicants listed Young Choi ("Choi") as their doctor on CIS Form I-693, Medical Examination of Aliens Seeking Adjustment of Status. I reviewed the tolls for NKUGBA's telephone number and determined that there were approximately 172 calls between NKUGBA and Choi from September 1, 2015 through June 3, 2017.

c.    Applicant M.W.A. did not list NKUGBA as a preparer on either his Form I-130 or his Form I-485, however, I reviewed the tolls for NKUGBA's telephone number and the number listed as M.W.A.'s number on his Form I-485 and determined that there were approximately 322 calls between M.W.A. and NKUGBA between November 22, 2015 through June 20, 2017. M.W.A.'s I-130 indicated that he married a U.S. citizen B.E.J. on December 16, 2015, in Inglewood, California. His Forms I-130 and I-485 were signed on January 15, 2016, and received by USCIS on February 17, 2016.

6

d.    Applicant R.H.M. did not list NKUGBA as a preparer on either his Form I-130 or his Form I-485, however, I reviewed the tolls for NKUGBA's telephone number and the number listed as R.H.M.'s number on his Form I-485 and determined that there were approximately 227 calls between R.H.M. and NKUGBA between September 3, 2015 through November 18, 2016.

e.    Applicant O.G. did not list NKUGBA as a preparer on either his Form I-130 or his Form I-485, however, I reviewed the tolls for NKUGBA's telephone number and the number listed as O.G.'s number on his Form I-485 and determined that there were approximately 42 calls between O.G. and NKUGBA between September 7, 2015 through March 19, 2016.

f.    Applicant J.V.A. did not list NKUGBA as a preparer on either his Form I-130 or his Form I-485, however, I reviewed the tolls for NKUGBA's telephone number and the number listed as J.V.A.'s number on his Form I-485 and determined that there were approximately 322 calls between J.V.A. and NKUGBA between December 15, 2015 through December 1, 2016.

g.    Applicant A.D.O. did not list NKUGBA as a preparer on either his Form I-130 or his Form I-485, however, I reviewed the tolls for NKUGBA's telephone number and the number listed as A.D.O.'s number on his Form I-485 and determined that there were approximately 170 calls between A.D.O. and NKUGBA between October 28, 2015 through March 21, 2017.

**B.    Applicant M.W.A. Agrees to Cooperate**

14.    On November 30, 2017, I conducted an interview with applicant M.W.A. regarding his visa application process.  During that interview, I showed M.W.A. a photo line-up containing six photos.  The photo line-up contained a CDL photograph of NKUGBA in box number 3.  I asked M.W.A. if he recognized anyone in the photo line-up.  M.W.A. pointed to box number 3 and stated that it was "Eme."[2]  M.W.A. then signed his name and placed the date next to box number 3.

---

[2] Throughout the interview M.W.A. referred to NKUGBA as "Eme."

15.     I asked M.W.A. to explain in detail how he met NKUGBA and how he entered into his marriage.  M.W.A. explained the following:

a.      M.W.A. met NKUGBA through a mutual acquaintance, Joyce, for whom NKUGBA had arranged a sham marriage for immigration benefits in 2007.  M.W.A. said that the process for Joyce had been successful and that Joyce had received her green card.[3]

b.      M.W.A.'s first meeting with NKUGBA was in December 2015 at NKUGBA's residence, located at 13200 Doty Avenue, Apartment 210, in Hawthorne, California.  During this meeting, NKUGBA introduced M.W.A. to the woman who M.W.A. was going to marry.  The woman departed after a brief meeting.  During the meeting, NKUGBA said that he could help M.W.A. get a green card for $24,000.

c.      Over the course of his green card application process, M.W.A. made the following cash payments to NKUGBA:

i.      $10,000 on the day of M.W.A.'s wedding;

ii.     $4,000 when M.W.A. received a letter from CIS confirming that they had received his Form I-485 application

iii.    $4,000 the day after M.W.A. had his fingerprints taken with CIS.

iv.     $2,000 on the day M.W.A. had staged pictures taken with his bride.

v.      $4,000 after M.W.A.'s green card interview.

d.      M.W.A. gave NKUGBA a copy of his I-94 and California Driver's License and NKUGBA filled out all the immigration forms and submitted them to CIS on M.W.A.'s behalf.

e.      M.W.A. had never lived with his wife and they had never consummated their marriage.

---

[3] I identified "Joyce" as J.O.  I reviewed DHS database information for J.O. and learned that she became a naturalized U.S. citizen on May 18, 2016 through a marriage to a U.S. citizen. The database information also revealed that J.O. became a LPR on November 3, 2007.

8

    f.      NKUGBA had many files and a computer. It appeared to M.W.A. that NKUGBA had a folder for all of his clients, including a folder for M.W.A.

    g.      NKUGBA told M.W.A. that he was a paralegal.

    h.      In order to prepare for his green card interview, M.W.A. met his bride at NKUGBA' residence one week before the interview. NKUGBA gave them sample questions to practice with each other.  M.W.A. gave me the sample questions he had received from NKUGBA.

    i.      M.W.A. booked a hotel for his bride the night before his green card interview, picked her up at the hotel the following morning, and drove her to the interview. M.W.A. has called NKUGBA several times after the green card interview to inquire about his green card. Each time, NKUGBA told him to wait for a letter in the mail.

    j.      NKUGBA told M.W.A. that he had been arranging fake marriages for over 15 years.

    k.      Every time M.W.A. went to NKUGBA's residence, there were other clients there. In or around December 2016, NKUGBA told M.W.A. that his new address was the SUBJECT PREMISES, but M.W.A. has not been to this location.

    l.      During M.W.A.'s first meeting with NKUGBA, NKUGBA gave M.W.A. a business card, which M.W.A. in turn gave me during our interview. On the business card, NKUGBA was listed as the Executive Director of Independent Representative at 13200 Doty Avenue, Suite 210, Hawthorne, California 90250, Tel XXX-XXX-3782, email: eme_NKUGBA@yahoo.com, website: www.5linx.net/newmillionaire. NKUGBA had hand written on the card his home number as XXX-XXX-1296.

**C.**    **NKUGBA Agrees to Arrange a Sham Marriage for M.W.A.'s Sister**

16.    On the same day I interviewed M.W.A., he agreed to place a consensually monitored and recorded call to NKUGBA. I listened to the call, during which M.W.A. told NKUGBA that his sister was considering "doing this," and asked NKUGBA if he could help, and NKUGBA said yes. NKUGBA told M.W.A. to come the following weekend and to bring

M.W.A.'s sister's documents. M.W.A. asked if they could meet the potential partner first, and they arranged to meet later that week at the SUBJECT PREMISES.

17.    On January 22, 2018, I listened to M.W.A. place another consensually monitored and recorded call to NKUGBA. During the call, M.W.A. told NKUGBA that his sister was "ready" and that they had the money. M.W.A. confirmed that $24,000 would cover "everything." NKUGBA told M.W.A. to bring his sister's passport and birth certificate so that NKUGBA can do the paperwork while M.W.A.'s sister meets her partner.[4]

18.    On February 7, 2018, M.W.A. and his sister met with NKUGBA at the SUBJECT PREMISES. The meeting was recorded and monitored in real time. Based on my review of the audio and video recording, I know the following:

    a.    Upon arriving, M.W.A. told NKUGBA that he still had not received his green card and NKUGBA told M.W.A. to "do InfoPass."[5]

    b.    M.W.A. asked NKUGBA where his sister's partner was and NKUGBA told M.W.A. that he had to work. NKUGBA then showed M.W.A. a photograph and told M.W.A.'s sister, "Here is your husband."

    c.    NKUGBA told M.W.A. and his sister that the price would be $25,000 and that the initial payment was $10,000. M.W.A.'s sister told NKUGBA that they did not have the money because they anticipated meeting her partner first, and NKUGBA responded that they would have to return later in the evening if they wanted to meet him.

    d.    NKUGBA explained that they would have to pay the initial $10,000 payment prior to the wedding and that it would take six to eight weeks after the wedding to receive the marriage certificate from the county. NKUGBA explained, "During that time, I'll be preparing all the documents. You will have to come and sign and he will come and sign."

---

[4] During a portion of the call, NKUGBA mistakenly begins to use "he" and "his" to refer to M.W.A.'s sibling, but M.W.A. corrects NKUGBA and explains he has a sister, not a brother.

[5] Based on my training and experience, I know that InfoPass is an online service that lets individuals with applications pending before CIS schedule an appointment with an immigration office so that they can inquire about the status of their pending application.

M.W.A.'s sister asked NKUGBA if the price would cover "everything" and NKUGBA responded as follows:

> Yeah. Everything. That's why you bring the filing fee. I will file. It will take four to six weeks. Then they will send you a receipt and that will be followed by an appointment letter for you to do your fingerprint. When you do your fingerprint, that's when you pay your fee for fingerprint. After your fingerprint, then they will send you your work permit. So once you receive your work authorization, then you go to Social Security and apply for Social. You get your Social within ten days. Then after your Social, then you apply for California ID. As soon as you receive your Social, that's when we start preparing evidence of living together. Even though you are not going to be living with him, but on paper you are going to add his name to the light bill, to the utilities of the house. You are going to add his name, your name. Let's say light bill, cable bill, mobile, gas bill. I'm going to bring him then to open up a joint bank account. In that account don't put all your money into that account. Have a separate account where you put your money. In this account just leave enough money to keep it open. Because I don't want him to go there and withdraw your. You get life insurance. You insure yourself. He becomes the beneficiary. Then you become the beneficiary. You have two policies. You can also get Costco membership while we are doing this. Every now and then, we go out and take pictures. You have to buy an album. Put the wedding pictures taken with your phone. Then more pictures to fill out the album. Each time we go out to take pictures, you have to feed us. We go to the park, we do to the mall. While we are doing all these things, they will send you that letter and you call me. Then you and him will start coming here one day each week for the preparation. We have all the questions. We will go through. We study and you give all the answers to the questions. And then we have our final review the day before the interview. I'll tell you how your supposed to interact with each other along the way. Each time you get the bills you will be bringing them to me. I'll put them in an envelope. Everything you need to take to the interview in the envelope.

      e.     During the meeting, NKUGBA answered a phone call during which he says, "it includes everything, medical, ceremony, everything and the filing fee. Tell him it includes everything."

      f.     NKUGBA can be seen going to a desk where there are many file folders stacked together and another desk where there is a computer. NKUGBA retrieves a folder from the desk, makes a copy of a document, and hands it to M.W.A.'s sister. I reviewed this document following the meeting and saw that it was titled "Items Needed To File Your Petition."

     19.     I have reviewed text messages between M.W.A. and NKUGBA, and they are iMessages. I know that iMessage is an instant messaging service developed by Apple and used on Apple operating systems.

**D.    A.D.O.'s Wife Admits to the Sham Marriage**

20.    On February 8, 2018, I interviewed A.J., a United States citizen who, based on my review of A-Files, I knew had filed the Form I-130 Petition for A.D.O. During that interview, A.J. admitted that she met A.D.O. through NKUGBA, who she identified from a six-photograph line-up. A.J. further explained that NKUGBA paid her $4,000 in exchange for marrying A.D.O. A.J. said that she has never lived with A.D.O, they never consummated their marriage, and she had seen him only once since their wedding.

## VI.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

21.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

22.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific

expertise in the types of digital devices, operating systems, or software applications that are being searched.

23.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

24.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 or more gigabytes are now commonplace. Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

25.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often

automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

26.    Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

27.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

28.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime. In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

29.     As discussed herein, based on my training and experience I believe that digital devices will be found during the search.  As explained above, M.W.A. received iMessages from NKUGBA, indicating that he uses an iPhone or iPad.

30.     I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

31.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.  Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

32.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then automatically unlocked if the

camera detects a face with characteristics that match those of the registered face. No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement). Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017). Apple calls its facial-recognition unlock feature "Face ID." The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

33.    While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data. The human iris, like a fingerprint, contains complex patterns that are unique and stable. Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light. Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels. A user can register one or both eyes to be used to unlock a device with these features. To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data from the person's eyes. The device is then unlocked if the camera detects the registered eye. Both the Samsung Galaxy S8 and Note 8 (discussed above) have iris-recognition features. In addition, Microsoft has a product called "Windows Hello" that provides users with a suite of biometric features including fingerprint-, facial-, and iris-unlock features. Windows Hello has both a software and hardware component, and multiple companies manufacture compatible hardware, e.g., attachable infrared cameras or fingerprint sensors, to enable the Windows Hello features on older devices.

34.    In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to

unlock a device than entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents.

35.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features have been enabled. This can occur when a device has been restarted or inactive, or has not been unlocked for a certain period of time. For example, with Apple's biometric unlock features, these circumstances include when: (1) more than 48 hours has passed since the last time the device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time. I do not know the passcodes of the devices likely to be found during the search.

36.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features (such as with Touch ID devices, which can be registered with up to five fingerprints), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the

device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual who is found at the SUBJECT PREMISES and reasonably believed by law enforcement to be a user of the device to unlock the device using biometric features in the same manner as discussed in the following paragraph.

37.    For these reasons, if while executing the warrant, law enforcement personnel encounter a digital device that may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to, with respect to every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is (a) located at the SUBJECT PREMISES and (b) falls within the scope of the warrant: (1) compel the use of the person's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of the face of the person with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature. With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

38.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.    NON-LAW-ENFORCEMENT PERSONNEL TO ASSIST WITH SEARCH

39.    Pursuant to 18 U.S.C. § 3105, HSI intends to have representatives of CIS present during the requested searches in order to aid law enforcement in the search of immigration related evidence.

## VII. CONCLUSION

40.    For all the reasons described above, there is probable cause to believe that evidence of violations of 8 U.S.C. § 1325(c) (Marriage Fraud); 18 U.S.C. § 1001(a) (False

Statement to a Federal Agency); 18 U.S.C. § 1015(a) (False Statements Under Oath Relating to

Naturalization, Citizenship or Registry of Alien); and 18 U.S.C. § 1546(a) (Fraud and Misuse of

Visas, Permits, and Other Documents), as described above and in Attachment B of this affidavit,

will be found in a search of the SUBJECT PREMISES, as further described above and in

Attachment A of this affidavit.

41.     In addition, there also is probable cause to believe that NKUGBA has committed

a violation of 8 U.S.C. § 1325(c), 18 U.S.C. § 2(a).


_/s/_

Loan McIntosh, Special Agent
Homeland Security Investigations


Subscribed to and sworn before me
this ___ day of May, 2018.

Frederick F. Mumm

HONORABLE
UNITED STATES MAGISTRATE JUDGE
Frederick F. Mumm

## ATTACHMENT A

PREMISES TO BE SEARCHED

     The SUBJECT PREMISES is located at 11500 South Budlong Avenue, Apartment 20, Los Angeles, California 9004.  It is a single-unit apartment located within a multi-unit two story apartment complex.  The SUBJECT PREMISES has a stucco-finish structure, cream in color, with dark brown trim.  The SUBJECT PREMISES is located on the first floor and the North West corner of the of apartment complex.  The SUBJECT PREMISES has the number "20" clearly marked in black on the front door.  The numbers "11500" is displayed above the front entrance of the apartment complex facing.

**ATTACHMENT B**

<u>ITEMS TO BE SEIZED</u>

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of  8 U.S.C. § 1325(c) (Marriage Fraud); 18 U.S.C. § 1001(a) (False Statement to a Federal Agency); 18 U.S.C. § 1015(a) (False Statements Under Oath Relating to Naturalization, Citizenship or Registry of Alien); and 18 U.S.C. § 1546(a) (Fraud and Misuse of Visas, Permits, and Other Documents) (the "Subject Offenses"), namely:

a.     Deeds, lease agreements, property tax statements, registrations, utility bills, rental agreements, purchase agreements, and any other documentation showing ownership or control of the SUBJECT PREMISES;

b.     Any documents relating to immigration petitions and applications for individuals other than EME CHU NKUGBA ("NKUGBA"), including United States Citizenship and Immigration Services Forms I-130, I-148, and I-693;

c.     Any documents relating to the marriage of individuals other than NKUGBA, including contracts or payments for wedding ceremonies, marriage certificates, and wedding photographs;

d.     Any documents relating to individuals who have sought, or are currently seeking, the assistance of NKUGBA pertaining to immigration and other legal matters;

e.     Invoices, records, and indicia of payments relating to immigration petitions and applications;

f.     Reference materials, notices, provider applications, copies of statutes or federal regulations relating to immigrant visas, and any other materials provided, produced, or generated by an agency of the United States government or any entity relating to: immigration laws or regulations; state or federal employment or labor statutes or regulations; and state or federal banking, transactional, or financial statutes or regulations;

g.      Financial records, including bank statements, check registers, cancelled checks, deposit items, financial instruments, wire transfers, invoices, general ledgers, and receipt books for the period of January 1, 2007 to the present;

h.      Hard copies or electronic telephone books and address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, documents and other items or less reflecting names, addresses, telephone numbers, addresses and communications among and between members and associates relating to the above-listed offenses;

i.      Records of mail and communications services, telephone pagers, answering machines, telephone paging devices, beepers, car telephones, cellular telephones and other communication devices which evidence participation in the above-listed offenses;

j.      Records of off-site locations to store records, including safe deposit box keys, records and receipts and rental agreements for storage facilities;

k.      Currency in quantities over $10,000, including the first $10,000 if more than $10,000 is found; and

l.      Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

m.      With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii.      evidence of the attachment of other devices;

iv.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.      evidence of the times the device was used;

vi.     passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.    applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.     records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.      As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical

disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

SEARCH PROCEDURE FOR DIGITAL DEVICES

    4.     In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

        a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

        b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

           i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

           ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

           iii.     The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.     If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to

be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.    If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

      a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.      Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.      Any magnetic, electronic, or optical storage device capable of storing digital data;

d.      Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.      Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.      Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.      Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.      During the execution of this search warrant, with respect to any person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a biometric sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant, the law enforcement personnel are authorized to: (1) depress the thumb- and/or fingerprints of the person onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of the person with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.

7.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.